UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GARY SAVAGE                          :
                                     :
            Plaintiff,               :
                                     :
    v.                               :        Case No. 1:06CV00081 (RCL)
                                     :
BIOPORT, INC.                        :
                                     :
            Defendant.               :

**BIOPORT'S REPLY BRIEF IN FURTHER
SUPPORT OF ITS MOTION TO DISMISS
OR, IN THE ALTERNATIVE, TO TRANSFER**

Defendant BioPort Corporation ("BioPort") respectfully submits this reply brief in further

support of its motion to dismiss this lawsuit for lack of personal jurisdiction or, in the alternative,

to transfer this lawsuit for lack of personal jurisdiction.

I.      **PRELIMINARY STATEMENT**

The United States Army administered Anthrax Vaccine Adsorbed ("AVA") to the

plaintiff at a United States Army facility – Fort Benning – in Georgia.  Plaintiff did not buy the

AVA used to inoculate him.  It was purchased by the United States Department of Defense

("DoD") pursuant to government contracts negotiated outside of the District of Columbia.  As set

forth in the declaration of Timothy Wibert accompanying BioPort's motion, those contracts are

administered by DoD from offices in Maryland and Virginia and performed by BioPort in

Michigan.  None of these events have any connection with the District of Columbia and there is

no basis for this Court to predicate personal jurisdiction over BioPort on them.

Plaintiff urges this Court to focus upon contacts between BioPort and the District of

Columbia that have no factual or temporal relationship to the product liability claims asserted in

his complaint based upon his 2002 inoculation with AVA. It simply is not possible, however, for plaintiff's cause of action to be related to contacts between BioPort and the District of Columbia occurring *after* his injury. The declaration of Timothy Wibert submitted in support of BioPort's motion makes it clear that the issue-oriented ads placed in *The Hill, Roll Call,* and *The Washington Times* ran in 2004. Publicly available documents, including press releases on the website of the Department of Health & Human Services, confirm that BioPort's contracts with that agency were entered into in 2005 and 2006.

Likewise, it simply is not possible for plaintiff's personal injury claims to be related to BioPort's nascent efforts to market AVA to the government of the District of Columbia for use by first responders. The plaintiff was not the target of these marketing activities and he was not inoculated with AVA purchased by the District of Columbia government. (Indeed, the District of Columbia has not purchased any AVA). Finally, plaintiff's personal injury claim is certainly not related to funds that BioPort has provided to an anthrax education partnership located at The George Washington University or BioPort's relationship with counsel in the District of Columbia. In sum, there is no connection between the claim asserted in this lawsuit and the forum.

What is more, even if all of BioPort's contacts with the District of Columbia were to be considered together (and even if many of them are not properly excluded from the jurisdictional calculus based upon the government contacts principle), they collectively fall far short of the type of continuous and substantial business operation in the District of Columbia required for the assertion of general jurisdiction.

Plaintiffs' suggestion that he should be permitted to take discovery so he can hunt for a basis for this Court to assert personal jurisdiction should be denied. Plaintiff has failed to meet

his burden to make a detailed showing of what discovery he wishes to conduct and what results he thinks such discovery would produce. But, more to the point, further information about BioPort's contracts with HHS, its issue-oriented ads, its funding to the anthrax vaccine education partnership, and its attempts to sell AVA to the District of Columbia government will not change the jurisdictional calculus. None of these contacts is related to plaintiff's cause of action. And, further information about these contacts will not lead to a basis for asserting general jurisdiction.

In the alternative, because the only connection between plaintiff's claim and this forum is that he lives here, the Court should exercise its discretion to transfer the case to the Western District of Michigan pursuant to Rule 1404(a).

## II.    FACTS

BioPort continues to rely on the facts set forth in the sworn declaration of Timothy Wibert submitted in support of its motion. In addition, the court may take judicial notice of the following facts concerning BioPort's contracts with the Department of Health & Human Services.[1] First, HHS press releases are publicly available on the department's website at www.hhh.gov/news/press. Two press releases on the website demonstrate that BioPort's

---

[1] The Court may take judicial notice of public documents without converting BioPort's motion into a motion for summary judgment. *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001). Federal courts regularly take judicial notice of government documents and documents from other reliable sources available on the Internet. *See, e.g., Grimes v. Navigant Consulting, Inc.*, No. 00 C 7609, 2002 U.S. Dist. LEXIS 1708 at *17 n.7 (N.D. Ill. Feb. 5, 2002) (taking judicial notice of historical stock prices from Yahoo!Finance) (citing *Austin v. American Ass'n of Neurological Surgeons*, 253 F.3d 967, 971 (7th Cir. 2001); *Cali v. East Coast Aviation Servs.*, 178 F. Supp. 2d 276, 287 (E.D.N.Y. 2001) (taking judicial notice of Web-based corporate documents and documents from Pennsylvania state agencies and FAA); *McLaughlin v. Volkswagen of Am.*, No. 00-3295, 2000 U.S. Dist. LEXIS 17505 at *10 n.3 (E.D. Pa. Dec. 6, 2000) (taking judicial notice of NHTSA website description of automobile recall); *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1216 (C.D. Cal. 2000) (taking judicial notice of content on Warhol Museum's Web pages); *In re Agribiotech Secs. Lit.*, No. CV-S-990144, 2000 U.S. Dist. LEXIS 5643 (D. Nev. Mar. 6, 2000) (taking judicial notice of public SEC filings from SEC Website); *Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 61 F. Supp. 2d 1058, 1066 (N.D. Cal. 1999) (taking judicial notice of FERC documents available on Internet); *Myers Investigative & Sec. Servs.*, 47 Fed. Cl. 288, 297 (Fed. Cl. 2000) (taking judicial notice of documents from SSA Website). The law is also clear that this Court can take judicial notice of regulations "incorporated into the Code of Federal Regulations," *see, e.g., In re Mora*, 199 F.3d 1024, 1028 n.7 (9th Cir. 1999), as well as entries in the Federal Register. *See American Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 106 (D.D.C. 2000).

contracts with HHS were awarded in March 2005 and March 2006. [Ex. A]. This is long after

plaintiff's 2002 inoculation. Second, as set forth in the May 6, 2005 press release, the AVA

purchased by HHS was "placed in the nation's Strategic Stockpile where it will be available for

use in the event of a bioterror anthrax incident." *Id.*

The Court also may take judicial notice of the following representations made by the

Partnership for Anthrax Vaccine Education on the website of The George Washington

University:

> Established by The George Washington University's School of Public Health, the
> Partnership's members include The George Washington University's School of
> Public Health and Health Services, The George Washington University Center for
> Emergency Preparedness, the American Medical Association, the American
> Nurses Association, the American College of Emergency Physicians, the
> American Society of Occupational Health Nurses, the American Council on
> Science and Health, the Society for Public Health Education, and the Global
> Health Council. The Partnership's mission is simple: To educate and inform the
> public on anthrax and anthrax vaccines using sound, science-based information,
> and to ensure that an adequate preparedness plan is established and maintained.

www.gwu.edu/~cih/**anthrax**info/misc/media_release_06-27-2003.htm. [Ex. B].

The accompanying declaration of Kimberly Root, BioPort's Director of Communications

and Government Affairs, confirms that the issue-oriented advertisements that BioPort placed in

*The Hill, Roll Call,* and *The Washington Times* ran in 2004 and that these are the only

advertisements placed by BioPort in any media from the time she joined BioPort in September

2000 through the present. [Ex. C].

The actual "advertisements" that BioPort ran in *The Hill, Roll Call,* and *The Washington

Times* are attached to the declaration of Kimberly Root. A review of the "advertisements"

confirms that they were issue-oriented placements directed at members of Congress, their staffs,

and other government officials. The first of the advertisements, entitled "Don't Gamble on an

Experimental Vaccine," focuses on the then current plans of HHS to exclude AVA from its

planned Strategic National Stockpile (SNS) of anthrax vaccine. The second, entitled

"Biothrax™; Proven, FDA Licensed and Ready to Protect America," refers to the decision of

HHS to buy 5 million doses of AVA (BioThrax) for the SNS, and states that "it is only a first

step." The third, entitled "Our Nation's First Responders Deserve the Protection of Licensed

Products, states "the Departments of Health and Human Services and Homeland Security should

move immediately to procure enough doses of BioThrax™ to protect first responders." The

fourth, entitled "They Protect Us . . . Why Shouldn't We Protect Them," also urges the

acquisition of AVA to protect first responders. [Ex. C, Tabs 1-4].

    The Court may also take judicial notice of the fact that the website of *The Hill* states that

its circulation of 21,000 is "aimed at the 100 senators, 435 House members, 40,000 aides and

tens of thousands in the influence industry whose work affects the lives of all Americans."

www.thehill.com. [Ex. D].

    Finally, as set forth in the Supplemental Declaration of Timothy Wibert, DoD takes

ownership of the AVA it purchases from BioPort while it is still physically located at BioPort's

facility in Michigan. [Ex. E, ¶ 3]. BioPort stores the AVA for DoD under a separate storage

contract. *Id*. At DoD's instruction, BioPort ships DoD-owned AVA to locations designated by

DoD. The cost of shipment is paid by DoD. *Id.* at 4.

## III.    ARGUMENT

### A.    This Court Cannot Assert General Jurisdiction Over BioPort

    Plaintiff does not dispute that, under controlling authority cited in BioPort's opening

brief, this Court cannot assert general jurisdiction over BioPort unless plaintiff served the

complaint on BioPort in the District of Columbia. Nor does plaintiff dispute that he served

BioPort in Michigan. Instead, seizing upon *dicta* in *Gorman v. Ameritrade Holding Corp.,* 293

F.3d 506, 516 (D.C. Cir. 2002), plaintiff urges this Court to find that he can cure his failure by serving BioPort a second time through substitute service on the Mayor pursuant to § 29-101.99 of the D.C. Code.[2]  There are several flaws in this argument.  First, the statement in *Gorman* is *dicta.*  Second, the recent decision of the D.C. Court of Appeals in *Gonzalez v. Internacional De Elevadores, S.A.,* 891 A.2d 227 (D.C. 2006) implicitly rejects the notion that substitute service on the mayor would satisfy § 13-334 (a).  There, in noting that general jurisdiction could not be asserted because the defendant was served in Mexico, the Court stated:

> [Mexico] **was the only place** where IDESA could have been served, since the company has no offices and maintains no registered agent in the District of Columbia or anywhere else in the United States.

*Gonzalez,* 891 A.2d at 233. (emphasis added).  The emphasized language cannot be squared with the notion that the plaintiff in *Gonzalez* could have satisfied §13-334 by serving the Mayor. Third, holding that §13-334 requires *actual* service in the District as opposed to *substitute* service on the Mayor makes sense:  a plaintiff plainly cannot make a plausible argument that the defendant has the continuous and substantial presence in the District required for the Constitutional assertion of general jurisdiction if the defendant cannot be found in the District of Columbia for actual service.  Allowing substitute service on the Mayor to suffice would be inconsistent with this logic.  Finally, BioPort has already been served, has not challenged the validity of service of process, and is present before this Court.  Plaintiff's proposed second "service" would be a fiction.

Turning to the substantive requirements for the assertion of general jurisdiction, plaintiff does he dispute that, as a matter of law, the assertion of general jurisdiction requires a "continuing corporate presence **in** the forum. . . ." *Atlantigas Corp. v. Nisource, Inc.,* 290 F. Supp. 2d 34, 53 (D.D.C. 2003).  He makes no argument that BioPort's contacts with the District

---

[2] To date, BioPort has not received notice from the Mayor of the District of Columbia of any such service.

of Columbia even remotely approach the level that is required for the Constitutional assertion of general jurisdiction over BioPort. Indeed, BioPort has no office or employees in the District of Columbia. It has no registered agent here. Even if BioPort's sales of AVA to DoD and HHS could properly be considered contacts with the District of Columbia, transacting business with the District of Columbia is not the same as being generally present in the forum. Plaintiff cites no case that holds to the contrary.

### B.     This Court Cannot Assert Specific Jurisdiction Over BioPort

The assertion of specific jurisdiction requires a defined nexus between the contacts of the defendant with the forum and the plaintiff's claim. This is true as a matter of statutory law under the D.C. long arm statute (D.C. Code § 13-423 (b)) and as a matter of Constitutional due process. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n.8, 104 S.Ct. 1868, 1872 n.8 (1984) (specific jurisdiction requires that the claim arise out of or relate to the defendant's contacts with the forum). *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174 (1985) (specific jurisdiction exists when the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities).

A court "cannot simply aggregate all of a defendant's contacts with a state – no matter how dissimilar in terms of geography, time or substance – as evidence of the constitutionally required minimum contacts." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275-76 (7th Cir. 1997); *CEM Corp. v. Personal Chemistry, AB*, 55 Fed. Appx. 621, 624-25 (4th Cir. 2003). Indeed, as this Court recognized: "[i]t would be impossible for [an] injury to arise from a contact

occurring months later." *World Wide Minerals, Ltd., v. Republic of Kazakhstahn,* 116 F. Supp. 2d 98, 106 (D.D.C. 2000).[3]

Commenting on the constitutional nexus between the defendant's contacts and the claim, the First Circuit has stated:

> [a]lthough this requirement is 'the least developed prong of the due process inquiry,' it serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendants' contacts with the forum."

*Sawtelle v. Farrell,* 70 F.3d 1381, 1389 (1st Cir. 1995). In *Sawtelle,* the First Circuit held that "the relatedness" requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather the cause of action must directly rise arise out of the specific contacts between the forum and the state." *Sawtelle,* 70 F.3d at 1389. *See also, RAR, Inc.,* 107 F.3d at 1275-76.

The D.C. Circuit has not articulated a specific standard for the relatedness requirement, either in general or in the context of a tort claim. Nevertheless, in *World Wide Minerals, Ltd. v. Republic of Kazakhstahn,* 296 F.3d 1154, 1168 (D.C. Cir. 2002), it did state that personal jurisdiction under the "transaction of business" prong of D.C.'s long arm is "'limited to claims arising from the particular transaction of business' in the District." (citation omitted). The First Circuit has expressly ruled that, in the context of a tort claim, the defendant's forum contacts must provide the "cause in fact" and "legal cause" for the plaintiff's injury. *Mass. School of Law v. American Bar Association,* 142 F.3d 26, 35 (1st Cir. 1998). The Ninth Circuit requires that the defendant's contacts be the "but for" cause of the plaintiff's injury." *Doe v. American National Red Cross,* 112 F.3d 1048, 1051 n.7 (9th Cir. 1997). The Third Circuit, while claiming not to

---

[3] On appeal, the D.C. Circuit noted the parties' agreement that the district court made an error about the date of some of the relevant contacts. The Court therefore remanded the case for further proceedings, but implicitly affirmed the district court's ruling that a claim cannot arise out of forum contacts that post-date the injury. *World Wide Minerals v. Republic of Kazakhstahn,* 296 F.3d 1154, 1168-69 (D.C. Cir. 2002).

have adopted a definitive test, appears to have endorsed an "effects test," which requires that "the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity." *Miller v. Yacht Sales, Inc, v. Smith,* 384 F.3d 93, 99 (3d Cir. 2004).

The D.C. Court of Appeals addressed the relatedness requirement in *Shoppers Food Warehouse v. Moreno,* 746 A.2d 320, 336 (2000). In *Shoppers,* the plaintiff was a District of Columbia resident who lived close to the Maryland state line. She was injured in a fall in a store operated by the defendant just over the Maryland state line. The court found that the defendant purposelessly directed advertisements to entice District of Columbia customers to its Maryland store, including one that stated "'No matter where you live . . . . it is worth the drive' to Shoppers." *Shoppers,* 746 A.2d at 331. Ruling on the relatedness requirement, the Court stated:

> . . . for the Superior Court to have jurisdiction over Ms. Moreno's claim, the claim had to be related to or substantially connected with Shoppers' advertising activity in the District . . . ; that is, it had to have some "discernible relationship" to Shoppers' advertising activity.

*Id.* at 335. The Court then found this "discernible relationship" between the contacts and the claim present:

> [w]here Shoppers has deliberately and directly solicited District residents to become customers of its Maryland and Virginia stores, there can be no doubt that its advertising relates to or has a discernible relationship to a claim by a District resident who becomes a customer in one of Shoppers' stores and is injured.

*Id.* at 335-36.

This "discernible relationship" test would appear to permit a more expansive assertion of personal jurisdiction than would be allowed under any of the relatedness tests articulated by the federal courts. On this score, it is worth noting, however, that "[w]hen determining whether state courts would have jurisdiction, . . . federal courts are under no obligation to defer to state court interpretations of federal law." *RAR, Inc.,* 107 F.3d at 1275-76. *See also, Systems Contractors*

*Corporation v. Orleans Parish School Board,* 148 F.3d 571, 575 n.23 ("[a]lthough state courts have the authority to decide issues of federal constitutional law, state court decisions are not binding upon the federal courts.")

It is clear that, under all of the federal court articulated standards discussed above, BioPort's contacts with the District of Columbia are not sufficiently connected with plaintiff's cause of action to allow the assertion of personal jurisdiction over BioPort in accordance with due process. BioPort's contacts with the District of Columbia are not the "cause in fact" or the "but for" cause of plaintiff's alleged injuries. Nor are plaintiff's alleged injuries the effect of tortious activity on the part of BioPort purposefully directed at the District of Columbia.[4]

Still, even if this Court were to apply the "discernible relationship" standard, the requisite connection between BioPort's contacts and the District of Columbia is still lacking. Although the "discernible relationship" test is broader than the federal court articulations of the relatedness standard, it still has definable limits. Indeed, in addressing concerns that the standard it had articulated would lead to "virtually unlimited jurisdiction," the D.C. Court of Appeals made it clear in *Shoppers* that the key to its finding of a discernible relationship was the fact that the plaintiff was in the "class" of customers specifically "solicited" by Shoppers in its advertisements, and that these same contacts with the District of Columbia would not justify the assertion of personal jurisdiction over tort claims unrelated to those advertisements:

> while Shoppers' advertising solicitation of customers from the District will
> support a slip and fall injury claim, vendors who sell their produce to Shoppers' –

---

[4] Citing *Shoppers,* plaintiff contends [Opp. 16] that this Court can assert personal jurisdiction over BioPort for the commission of at tort in the District of Columbia (even though he was inoculated in Georgia) because the "debilitation caused by BioPort's AVA continues to ravage his body." *Shoppers* does not remotely support this contention. There, jurisdiction was predicated on transacting business in the District of Columbia, and the Court noted that the lower court found jurisdiction lacking under the tort prongs of the long arm "because Ms. Moreno's injury occurred in Maryland, not the District." *Shoppers,* 746 A.2d at 320. Indeed, Ms. Moreno had been awarded damages for "future medical expenses". [*Id.* at 323]. Thus, the fact that a plaintiff continues to suffer the effects of an injury sustained outside of the District while living in the District of Columbia does not make the District the location of the tort for jurisdictional purposes.

or for that matter, a Shoppers' employee who slips and falls in a company warehouse in Maryland – are not within the class solicited by Shoppers' extensive advertising in The Washington Post."

*Shoppers,* 746 A.2d at 336.

In *Holder v. Haarmann & Reimer Corporation,* 779 A.2d 264 (D.C. 2001), the D.C. Court of Appeals again addressed the reach of the transacting business prong of the D.C. long-arm. There, the Court emphasized that, to be relevant to the transacting business calculus, the defendant's contacts must be related to the actual transaction of commercial *business*, noting that

if sufficiently close contacts *of any kind* between the nonresident defendant and the District of Columbia were sufficient to allow the Superior Court to exercise personal jurisdiction over that defendant under the "transacting business prong of section 13-423(a)(1) – then the other prongs of the long-arm statute would be superfluous.

*Haarmann,* 779 A.2d at 264, n.5.

Recently, in *Gonzalez v. Internacional De Elevadores, S.A.,* 891 A.2d 227 (D.C. 2006), the D.C. Court of Appeals addressed the required nexus between the contacts of a defendant and the claims asserted by the plaintiff. There, the plaintiff was injured in an elevator at the U.S. embassy in Mexico City. The defendant was an elevator maintenance company that had entered into a maintenance contract with the U.S. Department of State. *Gonzalez,* 891 A.2d at 235-36. Noting that the plaintiff was not a party to the maintenance contract, but merely an employee of the contracting party, the court found the requisite nexus between the claim and the contact missing. *Id.* at 236. It rejected the notion that its ruling in *Shoppers* required a different result and reiterated that the key to the Constitutional assertion of jurisdiction in *Shoppers* was that the fact that the defendant's advertising was specifically intended to lure the District of Columbia residents to its Maryland store. *Id.*

Here, there simply is no "discernible relationship" between BioPort's contract with DoD and plaintiff's claim. First, like the plaintiff in *Gonzalez,* the plaintiff here is not a party to

11

BioPort's contract with DoD. Moreover, as the Declaration of Timothy Wibert makes clear, none of BioPort's contract negotiations with the DoD have occurred in the District of Columbia. The contract is administered by DoD from Maryland and Virginia. BioPort performs its contract by manufacturing AVA in Michigan. DoD takes ownership of the AVA while it is still in the physical possession of BioPort. At DoD's direction, BioPort has sent less than one percent of DoD-owned AVA to the District of Columbia. Importantly, DoD's shipment instructions are unilateral acts. BioPort takes no part in the decision making process. Thus, even if BioPort's contacts with DoD are not excluded from the jurisdictional analysis under the government contacts principle (which, as discussed further below, they should be), these contacts with DoD have no connection with the District Columbia, and no discernible relationship to plaintiff's tort claim.

BioPort's other contacts with the District of Columbia do not have a discernible relationship to plaintiff's claim either. Plaintiff's contracts with HHS have no connection with plaintiff's claim either factually or temporally. BioPort entered into its contracts with HHS in 2005 and 2006 – long after plaintiff's 2002 injury. Plaintiff's claim does not arise out of BioPort's contract negotiations with HHS, and plaintiff was not inoculated with AVA sold to HHS. BioPort's 2004 placement of issue-oriented ads in the *The Hill, Roll Call* and *The Washington Times* also occurred long after plaintiffs' injury. Thus, those advertisements are not relevant to the jurisdictional inquiry on that basis alone. But, in any event, they bear no "discernible relationship" to plaintiff's claim. Plaintiff was clearly not within the "class solicited" by BioPort's ads concerning the wisdom of the United States government purchasing AVA for the Strategic National Stockpile or to protect first responders. As Mr. Wibert stated in his declaration supporting BioPort's motion, it is plain from the subject matter of the

advertisements and the publications in which they were placed that the "class solicited" was members of Congress, their staffs, and government decision makers.

Nor does plaintiff's cause of action arise out of BioPort's nascent and thus far unconsummated efforts to market AVA to the government of the District of Columbia to protect first responders. To paraphrase the D.C. Court of Appeals in *Shoppers,* plaintiff is not within the "class solicited" by those marketing efforts. Likewise, plaintiff's claims have no discernible relationship to the funds BioPort has provided to the Partnership for Anthrax Education. And, plaintiff's claims most certainly have no discernible relationship to BioPort's retention of D.C. based legal counsel.

Finally, the fact that BioPort knew that DoD – its customer – asked to take delivery of less than one percent of the AVA it purchased in the District of Columbia is simply not a sufficient predicate for the assertion of personal jurisdiction over BioPort in the District of Columbia for an injury that occurred at a federally owned facility in Georgia. Indeed, in the context of stream of commerce cases where – unlike here – the plaintiff actually suffered personal injury in the forum – the Supreme Court has repeatedly rejected the notion that a defendant's knowledge that its product was entering the forum is enough for the exercise of personal jurisdiction over that defendant to comport with the strictures of Constitutional due process. *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 100 S.Ct. 559 (1980); *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026 (1987).

Indeed, beyond the fact of an actual injury to the plaintiff in the forum, a crucial underlying premise of all stream of commerce cases is that the exercise of personal jurisdiction under this theory passes constitutional muster because the defendant obtains the benefits and protections of the forum based upon the indirect resale of its product in the forum. This is

13

evidenced decisively in the concurring opinion that Justice Brennan wrote in *Asahi* on behalf of

four justices who took what has been considered the more liberal view concerning the level of

contacts required for the assertion of personal jurisdiction based upon the stream of commerce

theory:

> The stream of commerce refers not to unpredictable currents or eddies, but to the
> regular and anticipated flow of products from manufacture to distribution to retail
> sale. As long as a participant in this process is aware that the final product is
> being marketed in the forum State, the possibility of a lawsuit there cannot come
> as a surprise. Nor will the litigation present a burden for which there is no
> corresponding benefit. A defendant who has placed goods in the stream of
> commerce benefits economically from the retail sale of the final product in the
> forum State, and indirectly benefits from the State's laws that regulate and
> facilitate commercial activity. These benefits accrue regardless of whether that
> participant directly conducts business in the forum State, or engages in additional
> conduct directed toward that State.

*Asahi,* 107 S.Ct. at 1034 -35. Indeed, in *World-Wide,* the Supreme Court stated that "[t]he forum

State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction

over a corporation that delivers its products into the stream of commerce with the expectation

that they will be **purchased in the forum state.**" 100 S.Ct. at 567 (emphasis added).

This reasoning simply does not apply here. BioPort did not expect the AVA it sold to

DoD to be purchased in the District of Columbia. Rather, it was BioPort's expectation that DoD

would be the end user of the product. That is in fact the case.

Even if the stream of commerce theory could appropriately be applied in this case in the

absence of any expected or actual resale of AVA in the District of Columbia, the law has been

clear since *World-Wide* that a defendant's mere release of a product into the stream of commerce

is not enough to Constitutionally predicate jurisdiction over the defendant in the forum of a

plaintiff's injury. *See e.g., Haarmann,* 779 A.2d at 273. Indeed, in *Burger King*, the Supreme

Court said that the "constitutional touchstone remains whether the defendant purposely

established minimum contacts with the forum State." *Burger King,* 105 S.Ct. at 2183. The Court

stated that this "purposeful availment" requirement cannot be satisfied by the unilateral acts of a third party. *Id.*

The Supreme Court later addressed purposeful availment in the context of the "stream of commerce" theory in its well known plurality opinion in *Asahi*. Writing for four justices, Justice O'Connor stated that "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Asahi,* 107 S.Ct. at 1033. She and the three justices joining her opinion found that more is required: "[a]dditional conduct [which] may indicate an intent or purpose to serve the market in the forum State." *Asahi,* 107 S.Ct. at 1032. She identified, as examples of such conduct, designing the product for the forum state, advertising in the forum state, and marketing the product through a distributor in the forum state. *Asahi,* 107 S.Ct. at 1032. Justice Stevens, however, did not agree with these factors, and in a concurrence joined by Justices Blackmun and White, opined that "purposeful availment" should be measured based upon the "volume, the value, and the hazardous character of the components" put in the stream of commerce. *Asahi,* 107 S.Ct. at 1037. He opined that the annual delivery of over 100,000 units in a regular course of dealing would be a good benchmark for purposeful availment. *Id.*

Here, plaintiff's claim does not arise out of any attempt by BioPort to purposefully avail itself, either directly or indirectly, of a market of District of Columbia consumers as customers. BioPort did not ship AVA to the District of Columbia for resale by retailers. Indeed, the only AVA that has entered the District of Columbia has been the result of the directions from DoD -- BioPort's customer and the end user of the vaccine. DoD's decision to instruct BioPort to send

15

DoD-owned AVA to the District of Columbia is precisely the type of unilateral act of a third party that is not sufficient to constitute purposeful availment. *Haarmann,* 779 A.2d at 273-74.

### C.    Virtually All of BioPort's Contacts With the District of Columbia are Excluded from the Jurisdictional Analysis Under the Government Contacts Principle

Plaintiff contends that the government contacts principle only removes non-commercial contact with the federal government from the jurisdictional analysis.[5] This argument was expressly rejected in *Coalition on Sensible Transportation v. Dole,* 631 F. Supp. 1382, 1385 (D.D.C. 1986) where the Court found that the doctrine applies to commercial contracts with the federal government as well. In *Coalition*, the Court noted that a three judge panel of the D.C. Court of Appeals had ruled – in *Rose v. Silver,* 394 A.2d 1368 (1978) – that the government contacts exception only applies to the exercise of first amendment rights, but that two years earlier, an *en banc* panel of the D.C. Court of Appeals had rejected this limitation in *Environmental Research International Inc. v. Lockwood Greene Engineers, Inc.* 355 A.2d 808 (1976). In *Coalition,* this Court found the *en banc* opinion controlling. *Coalition,* 631 F. Supp., at 1385.

The case relied upon by plaintiff, *Johns v. Rozet,* 770 F. Supp. 11 (D.D.C. 1991), followed the ruling in *Rose* without acknowledging the existence of the prior *en banc* opinion in *Environmental Research.* In addition, the opinion in *Rozet* failed to acknowledge prior case law stating that the policy behind the government contacts principle is not solely the first amendment, but also the need to prevent the "creation of national supercourts in the District of Columbia." *Zeneca Limited v. Mylan Pharmaceuticals, Inc.*, 173 F.3d 829, 831 (Fed. Cir. 1999); *Coalition,* 631 F. Supp. at 1384. This Court should follow *Coalition* and find that the twin

---

[5] Thus, even plaintiff cannot dispute that the government contacts principle covers visits to the District of Columbia by BioPort personnel to provide information and testimony to members of the United States government concerning AVA.

purposes of the government contacts principle are best served when all of a defendant's contacts
with the federal government in the District of Columbia are excluded from the jurisdictional
calculus.

In any event, there is no dispute that, even if this Court declines to follow *Coalition*,
"[t]he fact that [defendant] may have lobbied Congress to promote a proprietary interest does not
remove the[] actions from the realm of first amendment activity." *Dooley v. United
Technologies Corp.,* 786 F. Supp. 65, 77 (D.D.C. 1992). BioPort's issue-oriented ads clearly fall
within this category. What is more, commercial contacts with the federal government are not
contacts with the District of Columbia for purposes of a personal jurisdiction analysis if the
contacts with the federal government actually take place outside of the District. *Freiman v.
Lazur,* 925 F. Supp. 14, 23, 25 (D.D.C. 1996); *Hughes v. A.H. Robins Company, Inc.*, 490 A.2d
1140, 1150 (D.C. 1985). In *Freiman*, the Court twice found that an office of the United States
Department of Energy located in Germantown, Maryland was not located in the District of
Columbia for purposes of a personal jurisdictional analysis. First, the Court rejected plaintiffs'
argument that their tortious injury, for purposes of jurisdiction under Section 423(a)(3) of the
District of Columbia long arm, had occurred in Washington, D.C. because "the approval for the
contracts and the monies for the approved contracts from which the Defendants are profiting
comes from the headquarters of the Department of Energy in Washington D.C." *Freiman*, 925
F. Supp. at 23 (internal quotation marks omitted). The Court found that this allegation was
"contradicted" by the fact that plaintiff's contact with the Department of Energy was located in
Germantown, Maryland. *Id.*, 925 F. Supp. at 23. Second, the Court found that the certain
defendants' contacts with the Department of Energy's Germantown, Maryland office were not

contacts with the District of Columbia for purposes of establishing that those defendants "transacted business" in the District of Columbia. *Id*. at 25.

Likewise, in *Hughes*, the Court rejected the notion that the defendant's "commercial dealings" with the federal government constituted contacts with the District of Columbia because defendant's "only commercial dealings with the federal government, as far as the record discloses, take place outside the District." *Hughes,* 490 A.2d at 1150. Indeed, it has been long established that substantial commercial contacts with the federal government outside of the District of Columbia are insufficient to constitute "transacting business" in this forum. In *Weisblatt v. United Aircraft Corporation,* 134 A.2d 713 (D.C. 1959), the Court found that the non-resident defendant was not "transacting business" in the District of Columbia, even though 85% of its business was with the federal government, because the products were delivered and used outside of the District. *Id.* at 714.

Here, BioPort's contract negotiations with DoD occurred outside the District of Columbia and the contract is administered by DoD from Maryland and Virginia. As a consequence, these are not contracts with the District of Columbia.

### D.    The Exercise of Personal Jurisdiction Over BioPort Would Not Comport With Traditional Notions of Fair Play and Substantial Justice

Even if the minimum contacts test is met, the exercise of personal jurisdiction over BioPort here would not comport with fair play and substantial justice as measured by the factors articulated by the Supreme Court in *Burger King*. *Burger King,* 105 S.Ct. at 2184. The first factor, the burden on BioPort of defending this lawsuit, cannot be measured simply by considering the claim asserted here. If this Court finds that the purposeful availment requirement is satisfied by BioPort's shipment of DoD-owned AVA to the District of Columbia at DoD's direction, then similarly situated plaintiffs can make the same argument in every jurisdiction

18

where DoD has directed BioPort to ship AVA. BioPort currently has jurisdictional motions pending in similar lawsuits recently filed in Illinois and Washington. The burden of defending multiple lawsuits in multiple jurisdictions would be significant for BioPort, a company that sells the vast majority of its only product to the federal government.

The second factor, the forum state's interest in adjudicating the dispute, tilts in BioPort's favor. Plaintiff was allegedly injured while serving in the U.S. military by a product administered to him by the U.S. Army at a U.S. Army facility in Georgia. He was not injured as the result of actions by BioPort directed at District of Columbia residents. The interest of the District of Columbia in resolving the dispute is *de minimus*. In contrast, a product liability lawsuit, the locale where the product was produced has the stronger interest. *Hodson v. A.H. Robins*, 528 F. Supp. 809, 823 (E.D. Va. 1981).

The third factor is the plaintiff's interest in obtaining convenient and effective relief. Plaintiff has made no showing that he cannot proceed effectively with his lawsuit in Michigan. While he refers to the location of his treating physicians, the reality is that the number of witnesses relating to his medical condition is small in comparison to the number of present and former BioPort employees (most residents of Michigan) relevant to the resolution of the product liability claims in the lawsuit. Many of these individuals will not be subject to compulsory process in the District of Columbia.

The fourth factor, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, also favors BioPort. As noted in BioPort's opening brief, similar claims asserted by more than 100 plaintiffs in the District of Columbia, New Jersey, Louisiana and New Mexico were previously transferred to the Western District of Michigan for resolution. On April 19, 2006, after considering an extensive summary judgment record, Judge Quist

19

entered an order granting BioPort's motion for summary judgment. [Ex. F]. He found that BioPort is entitled to immunity from claims brought by military personnel under the government contractor defense and is also entitled to the immunity afforded by Michigan's drug producer product liability statute. Requiring BioPort to re-litigate the same issues in this Court (and in other courts across the country) would not comport with the interstate judicial system's interest in obtaining the most efficient resolution of controversies.

For the same reason, the last factor, "the shared interest of the several States in furthering fundamental substantive social policies" also tilts in BioPort's favor. The government contractor defense is an immunity from liability recognized and endorsed by the United States Supreme Court. It is not in the interest of the several States to require BioPort to litigate its entitlement to the protection afforded by the defense over and over in numerous jurisdictions. Indeed, to require it do so would effectively eviscerate the benefit of the protection afforded by the defense.

## E.    Plaintiff's Request for Jurisdictional Discovery Should be Denied

"When requesting jurisdictional discovery, . . . a plaintiff must make a 'detailed showing of what discovery it wishes to conduct and what results it thinks such discovery would produce.'" *Atlantigas Corp., v. Nisource, Inc.,* 290 F. Supp. 2d 34, 53 (D.D.C. 2003) (*quoting United States v. Philip Morris Inc.,* 116 F.Supp.2d 116, 130, n.16). "Where there is no showing of how jurisdictional discovery would help plaintiff discover anything new, 'it [is] inappropriate to subject [defendants] to the burden  and expense of discovery.'" *Id.* (*quoting COMSAT v. Finshipyards S.A.M.,* 900 F. Supp. 515, 524, n.4).

Here, plaintiff has failed to make the requisite showing. Further information about BioPort' contracts with HHS, its issue-oriented ads, its funding to the anthrax vaccine education partnership, and its attempts to sell AVA to the District of Columbia government will not change

the jurisdictional calculus.  None of these contacts is related to plaintiff's cause of action.  And, further information about these contacts will not lead to a basis for asserting general jurisdiction. There is simply no reason to require BioPort to incur the expense of discovery relating to these contacts.

> **F.    In the Alternative, This Lawsuit Should be Transferred Under 28 U.S.C. § 1404(a)**

The factors relevant to the § 1404(a) inquiry overlap somewhat with the factors relevant to the constitutional fair play and substantial justice inquiry.  BioPort incorporates its arguments above as well as the arguments made in its opening brief.

## IV.    CONCLUSION

For the foregoing reasons, BioPort's motion should be granted.

Respectfully submitted,


_____/s/ Gerald Zingone_____
Gerald Zingone
THELEN REID & PRIEST LLP
701 Eighth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 508-4332
Facsimile:  (202) 654-1841
E-mail:  gzingone@thelenreid.com


Dated:  June 16, 2006